## Charles P. Treat v. Cora Smith.

### Gen. No. 13,533.

1. PRINCIPAL AND AGENT—*how far latter may bind former.* The principal is bound by the acts of his agent within the apparent authority which the principal knowingly permits the agent to assume or which he holds the agent out to the public as possessing.

2. VENDOR AND VENDEE—*construction of contract as to election of rights.* A contract for the purchase and sale of real estate which contained as well a forfeiture clause as a clause giving to the vendor in case of default in payment by the vendee an option by election to treat the covenants and liability of the. vendee as living, obligatory and enforceable and to collect all the consideration money from the vendee by proper proceedings at law or equity, is considered, but the court does not finally pass upon the question as to whether or not under the contract involved the right to a forfeiture is lost by an apparent election to keep the contract alive.

3. FORFEITURE—*when notice of intention to enforce, essential.* A forfeiture cannot be enforced under a contract providing therefor in event of default without notice of intention to enforce a forfeiture where the party seeking to forfeit the same has by his conduct induced the other party thereto to believe that the provision that time was of the essence of the contract would not be insisted upon.

4. CONTRACT—*when right to rescission arises.* A vendee may rescind where the vendor without warrant and right has sought to enforce a forfeiture and has placed himself in a position where he cannot perform.

5. CONTRACT—*when purchase money may be recovered upon rescission.* A vendee of real estate may recover payments made under a contract to purchase where the vendor has illegally sought to enforce a forfeiture by making to a third party a conveyance of the property covered by the contract of purchase.

6. MEASURE OF DAMAGES—*in action to recover money paid under rescinded contract.* Where a vendee is entitled to rescind, and has rescinded, he may recover as his measure of damages any money

Treat v. Smith.

paid under the contract in question plus interest from the time of the commission of the act which entitled rescission.

Assumpsit. Appeal from the Superior Court of Cook County; the Hon. BEN M. SMITH, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed December 23, 1907.

Statement by the Court. This is an appeal from a judgment of the Superior Court of Cook county in favor of Cora Smith, the appellee, who was plaintiff below and will be so denominated in the opinion, against Charles P. Treat, the appellant here and defendant below. The suit was begun below on February 14, 1905. It was in assumpsit, and the amended declaration on which the case was tried contained five special counts and the consolidated money counts. The special counts were, however, alike, except in the description of the lot involved in the transaction sued on.

The first count alleged that on August 20, 1890, the plaintiff and defendant entered into a contract in writing for the sale by the defendant to the plaintiff of lot twenty in block four of Treat's subdivision of the northeast quarter of the southwest quarter of section two, township thirty-nine, north, range thirteen east of the 3rd P. M., in Chicago, Illinois. The contract is then set out in *hœc verba.*

It provides for the payment of $400 for the lot by the plaintiff to the defendant in this manner: $10 cash in hand, $7 or more, on September 20, 1890, and $7 or more "at the end of each and every period of one month thereafter until the whole sum of $400 shall be fully paid, with interest at the rate of 6 per cent per annum from date. The interest was to be payable semi-annually and principal and interest were made payable at the office of Treat, "his attorney, executors, administrators or assigns," in Chicago. Any improvements placed on the lot were to be held as a part of the security for the prompt payment of each of the payments contracted for.

A clause relating to the payment of taxes reads:

"And also that he will well and faithfully in due season pay or cause to be paid all taxes and assessments    *    *    *  subsequent to 1889."

(NOTE.  *It is impossible to tell from the context to whom
the pronoun "he" relates, but it may be assumed, as it was
so treated, that it refers to the vendee.*)

Covenants as follows are included in the contract:

"In case said party of the second part (*i. e.* Cora Smith)
shall make default or fail to make any of the payments
above mentioned at the time and times above limited (the
said time and times of payment being hereby declared to be
an essential part of this contract), or shall fail to perform
punctually any of the covenants and agreements herein men-
tioned at such time or times and for ten days thereafter, then
in such case this agreement and all the covenants and agree-
ments on the part of the said party of the first part (*i. e.*
Treat) herein contained shall at the option of the said party
of the first part, his representatives or assigns, be and are
declared null and void, and no longer binding, and all the
right or interest either in law or equity of said party of the
second part shall cease and be determined, and all the pay-
ments which shall have been made hereon, or in pursuance
hereof, and all buildings and other improvements which are
now on or shall hereafter be placed on said premises, shall be
absolutely and forever forfeited to said party of the first
part, and he shall have the right to re-enter and take pos-
session, or at the election of the said party of the first part,
his representatives or assigns, the covenants and liability of
the said party of the second part shall continue and remain
obligatory upon the said party of the second part, and may
be enforced, and the said consideration money and every part
thereof be collected by proper proceedings in law or equity
from the said party of the second part, her heirs, executors,
administrators or assigns.

The said party of the second part further agrees that in
case she shall not make the payments above named on the
days they are respectively made payable, she will pay inter-
est on any payment or part payment which shall remain un-
paid after due at the rate of 8 per cent per annum until
paid.   But nothing herein contained shall be construed as a
waiver of the right of said party of the first part to declare

Treat v. Smith.

this contract forfeited for non-payment as hereinbefore provided."

The contract is signed:     CHARLES P. TREAT,
                      by Henry C. Decker [SEAL]
                         Attorney in fact.
                      CORA SMITH.          [SEAL]

After setting out the contract the declaration alleges that in pursuance of it the plaintiff paid on it at various dates sums amounting in the aggregate to $341.16; being $10 on August 20, 1890; $7 on September 27, 1890; $7 on November 4, 1890; $7 on December 17, 1890; $7 on January 20, 1891; $7 on February 5, 1891; $7 on March 2, 1891; $7 on April 6, 1891; $10.08 on June 9, 1891; $33.89 on November 25, 1893, and $238.19 on November 27, 1893; and that the defendant on the said respective dates accepted the payments without objection to the times when made, and at various times prior to the date when the final payment by the plaintiff was due under contract and subsequent thereto, requested the plaintiff to make payments under said contract and to provide for taxes and assessments levied upon said real estate, and made no attempt to forfeit said contract, but in his communications with said plaintiff referred to the same as in force, whereby the said defendant waived the provision that time was of the essence of said contract and elected to hold the plaintiff to her liabilities thereunder.

It also alleges that notwithstanding the premises, the defendant on October 22, 1901, sold and conveyed said real estate to one Gross by warranty deed, that the plaintiff made no objection to said sale and conveyance, and thereafter made demand upon the defendant for the sums of money paid by her under said contract, whereupon the contract became and was rescinded and the defendant became and was liable to repay to the plaintiff the payments made by plaintiff under the contract amounting to $341.16, and being so liable promised to pay the same.

The second, third, fourth and fifths counts respectively are in identically the same terms as the first, except that they

deal respectively with contracts involving lot 21, lot 22, lot 23 and lot 24 in block four of Treat's subdivision.

To this declaration the defendant pleaded the general issue.

On a rule to file a bill of particulars setting forth the dates of the waiver of time of performance of the contract alleged by plaintiff, she filed one giving the date of the payments on the contracts subsequent to the second one, as set forth in the declaration, and also the dates of August 19, September 8, September 12 and November 17, 1899, and February 15 and December 5, 1900—these additional dates being those of certain letters written by Mr. Collins, an agent of the defendant, to the plaintiff, which will be alluded to in the opinion.

The cause was submitted to the court, a jury being waived, and after a trial the court found the issues for the plaintiff and assessed the damages at $2,057.19, giving, after a motion for a new trial and a motion in arrest of judgment had been overruled, judgment for that amount against the defendant.

In this court the assignments of error challenge the rulings of the court below on the admission and exclusion of evidence, his holdings on certain propositions of law submitted to him and his refusal to find for the defendant.

HUFF & COOK, for appellant; HAMLIN & BOYDEN, of counsel.

JAMES S. WRIGHT and ROBERT I. GREGG, for appellee; FREDERICK PEAKE, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

There is in this case very little conflict of evidence. The contest is chiefly over the rules of law applicable to conceded facts.

The defendant, Charles P. Treat, although describing himself as of Chicago in conveyances, seems, during the long time involved in the matters under discussion herein, to have almost continuously been away from it. He was occu-

pied in other places far remote.   He had an office in the Rookery Building in Chicago, but he was in that office and in Chicago but four or five times from 1891 to 1903, according to the testimony of his employee, Collins.   Whether he was here more frequently before or after this twelve years, the record does not show.   But he was the owner of land in Chicago divided into several hundred lots and platted under the name of C. P. Treat's subdivision, etc.   In the advertisements of these lots his "office" in connection with their sale was indicated to be at "Room 1106, Rookery Building, and also on the premises at the corner of Central Park avenue and Division street."

In August, 1890, a man named Decker seems to have been in charge of the business of Mr. Treat in relation to this land, in the office at the Rookery Building.   Just when Mr. Decker left the office or employ of Mr. Treat does not appear, nor whether Mr. Decker, a Mr. Lane and a Mr. Collins were all there together.   But the counsel for Mr. Treat stated in open court that "Mr. Decker was first there and Collins followed him," so that we may assume that Decker and Collins were not to any material extent contemporaneous.   Mr. J. A. Lane was there, however, according to Mr. Collins' testimony, as head bookkeeper for Mr. Treat for several years after he, Collins, "went in there."   "He passed on all the stuff," Collins says, "I turned in."

But for several years Collins was the only representative or employee of Treat in his office in Chicago, which was moved from 1106 to 520 Rookery Building.   He says, "We sublet desk room to other people.   There was no one else in charge of Mr. Treat's business;" and to the leading question, "You were the only one in charge of his (i. e., Treat's) business?" he answered, "I was the only one there."

Under date of August 20, 1890, the plaintiff, Mrs. Cora Smith, purchased and executed contracts in relation to twenty of the lots in Treat's subdivision, doing the business with Decker at the office in the Rookery Building.   For each of the lots a separate contract was executed, and all were in the

form set forth in the declaration in this case and recited in the statement hereto prefixed.

Mrs. Smith, after her first payment of $10 on each of the lots on receiving the contracts, made payments on each of the twenty contracts at somewhat irregular intervals between and including September 27, 1890, and June 9, 1891. On each of the five contracts which are involved in this suit there appear indorsements of $10, paid when apparently the contracts were delivered August 29, 1890, and $7 on September 27, 1890 (which would be seven days late under the strict terms of the contract, but within the ten days grace given therein), $7 on November 4, 1890 (15 days late), $7 on December 17, 1890 (27 days late), $7 January 20, 1890 (31 days late), $7 February 5, 1891 (16 days late), $7 March 2, 1891 (10 days late), $7 April 6, 1891 (17 days late), and $7 June 9, 1891 (50 days late); also on June 9, 1891, $3.08 for the taxes of 1890.

It may be assumed that payments were made on the other 15 contracts at the same time, although apparently there was some difference in the price and consequently in the installments on one or more of the lots.

On some account in connection with her purchases Mrs. Smith evidently paid $82.60 on June 2, 1892, also, and $50 on August 8, 1892, after which her payments ceased. She herself testified that her last payment "seems" to have been made on June 9, 1891, but we think that the account received by her from the defendant's office (Plaintiff's Exhibit 20) is evidence to the contrary.

On June 24, 1893, for an expressed consideration of $100, which may or may not have been as much or more than she had paid on that contract, Mrs. Smith assigned one of the contracts to one Emma Mast, with the assent and concurrence of Mr. Collins, who must have been in this acting as the agent of Mr. Treat, and this one lot was eliminated from the transactions between the parties hereto.

At or about November 25, 1893, an agreement was made between Mrs. Smith and Mr. Treat, the latter acting through a representative, which the evidence fairly leaves us to infer

Treat v. Smith.

was Mr. Collins—although the indorsements involved are in the hand of Mr. Lane, "the head bookkeeper"—by which Mrs. Smith gave up any claim on fourteen of the contracts and cancelled them in consideration of having the money she had paid on them, which apparently amounted to $1,360.40, credited to her on whatever was due on the remaining five lots for interest, taxes or installments or principal.

In the execution of this arrangement the following indorsements (with a variation of a few cents only in one or two of the items) were made on each of the contracts involved here:

Nov. 25, '93, Received $4.47 for Grand Avenue sewer assessment.

Nov. 25, '93, Rec'd $3.40 for 1891 tax.

Nov. 25, '93, Rec'd $10.75 for first installment sewer tax.

Nov. 25, '93, Rec'd $3.64 for 1892 tax.

Nov. 27, '93, Rec'd $1.63 for second installment sewer tax.

Nov. 27, '93, Rec'd $28.16 for interest to Nov. 30, 1893.

Nov. 27, '93, Rec'd $210.03 on principal.

The indorsements altogether make on the five contracts the aggregate $1,705.83.

After November 27, 1893, the matter affecting this transaction appearing in the record consists entirely of correspondence and a warranty deed of the lots in question with many others, made by Mr. Treat and wife to Homer E. Gross for the alleged consideration of $50,000 on October 22, 1902.

All the correspondence between the parties connected with the transaction does not appear. Various letters are referred to in answering communications, which are not in the record. But enough of it appears to show clearly, we think, the intentions and attitude of the parties on the material questions here presented.

The correspondence, so far as it appears in the record, begins with a letter purporting to be from C. P. Treat, the defendant himself, dated at 97 Gresham street, London, November 16, 1898, which, it should be noted, is more than seven years after the last cash payment had been made on the lots by Mrs. Smith, and almost exactly five years after the last indorsement had been made on the contracts. In that

letter Mr. Treat says:   "I could not buy your lots at present, as I have all of that sort of property that I can carry.   It seems to me that there is no doubt that within a year or two there will be a good demand for them at fair prices."

A strenuous attempt was made by the appellant to keep this letter out of evidence on the ground that it was not shown to be the letter of Mr. Treat, or that it referred to the property involved here, and the action of the trial judge in admitting it is vigorously attacked in this court as erroneous.

The plaintiff testified that prior to receiving this letter she had addressed a letter to Mr. Treat, marked "Strictly Personal," and that she had received this letter introduced in evidence purporting to be personally signed by him in London, in reply.   She testified also that the lots referred to were the lots described in the five contracts introduced in evidence, which she purchased from Mr. Treat.   Mr. Collins, a witness produced by the defendant, was asked on direct examination by the counsel for the defendant, if he was familiar with the handwriting of Mr. Treat, and answered that he was.   Asked by counsel for defendant if the *letter* was in Mr. Treat's handwriting, he said "No, he didn't write the *letter*."   But in this answer he was plainly referring to the body of the letter and was hardly ingenuous, for being immediately asked by the court if the signature was Mr. Treat's, he answered, "Yes, it is his signature—it looks like his signature, and I think it is."

If the signature was Mr. Treat's, it certainly was of no importance that the body of the letter was the work of an amanuensis.   The letter plainly treats the lots in question, at this very considerable length of time after the payments had ceased, as still the property of Mrs. Smith, in which she had at least a subsisting and substantial equitable interest.

The rest of the correspondence appearing in the record is entirely between Mr. Collins, before mentioned, who generally, however, signed his letters, "C. P. Treat, Collins," and Mrs. Smith.

There were introduced three letters and a receipt from one George W. Wilbur to Mrs. Cora Smith, but two of these

Treat v. Smith.

letters bore indorsements or additions by Mr. Collins and were admitted only to the extent and for the purpose of showing knowledge by Mr. Collins "of what was being done and his action in the premises." The other letter and the receipt were stricken out of evidence by the court before the finding was made.

The letters from Collins to Mrs. Smith were introduced for the purpose of showing that the defendant considered and treated the right of forfeiture given by the contracts for the non-payment of instalments due promptly as waived, and had elected in accordance with the terms of the contract to continue them in force.

It is urged that they were inadmissible and can be held to prove nothing against Mr. Treat, the defendant, because there was no showing that Mr. Collins had authority to sign the name of Mr. Treat to these letters,—that as interpreted by the plaintiff and the court below, they changed the contracts, and that Mr. Collins was a bookkeeper with only the powers ordinarily possessed by a bookkeeper and could not change the contracts.

To sustain this position counsel cite Mr. Collins' own testimony, who, although testifying that he was the only one in charge of Mr. Treat's business in Chicago, that he received money on contracts for lots and carried on correspondence with the contracting parties, that he wrote the letters referred to and signed them with Mr. Treat's name, and that Mr. Treat was in Chicago but four or five times in the twelve years he worked for him, answered thus, over the repeated objections of defendant's counsel, to questions of the plaintiff's counsel who called him as a witness:

"Q. Who attended to all these real estate matters in connection with C. P. Treat's Subdivision?

A. I had charge of collecting the payments as made on contracts and when people were slow of poking them up. * * *

Q. Is it not a fact that you had the general charge of Mr. Treat's real estate business in Chicago, especially of real estate in C. P. Treat's Subdivision for Mr. Treat?

\* \* \*   A.   Well, the interest I had in it was to collect such payments as were made.

Q.   Well, hadn't you general charge of it?

A.   Well, I paid the general taxes on it.

Q.   Hadn't you general charge of it?

A.   When Mr. Treat would send me the money I would pay the taxes.

Q.   Hadn't any other interest in it?   A.   No.   \* \* \*

Q.   Do you remember when Mr. Peake (of the plaintiff's counsel) first came to see you a few weeks ago?

A.   Yes, sir.

Q.   Did you at that time make the statement to him that you were in general charge of Mr. Treat's real estate business here in Chicago during the time that you have stated you were in his employ?

A.   As to whether I was his agent or not?

Q.   Whether you had general charge of his real estate?

A.   As I recollect it, this gentleman put the question in that way.   I made the statement, and I probably said it to him, that is my recollection of it.   My understanding of the question was that I had charge to keep his books, collect the payments as made, turn them over to him and report them to him—in that way I had charge of it.

The Court:   Let me understand you correctly.   That to the best of your recollection he asked if you were general manager, as you understood it, as you now define your duties?

A.   That is it exactly; that is just what I meant to say."

He was then asked on cross-examination by Mr. Treat's counsel: "You had no further authority that the authority just testified to?   A.   No, sir."

Upon this testimony and the legal proposition that "one who deals with an agent is bound to know the extent of his authority," the defendant claims that he was not bound by the letters written by Collins.

The trial court was at liberty to judge of the directness, thoroughness and ingenuousness of Mr. Collins' denial of authority to write the letters which he did write, inferred by defendant's counsel from this testimony, and the rule of law alluded to certainly has its limitations.   The principal is

bound by the acts of his agent within the apparent authority which the principal knowingly permits the agent to assume or which he holds the agent out to the public as possessing. It was to an office of which Mr. Treat was, during the years when these letters were written, the only occupant, as an employee of Treat, and which Treat was hardly ever near, that persons desirous of dealing with the land in question were directed. The contracts themselves were executed by an agent or representative of Mr. Treat, not by Mr. Treat himself, and of that agent or representative, Mr. Collins, whatever his actual authority, seems to have been the ultimate sole apparent successor. Mr. Treat himself did not take the stand to deny the alleged unauthorized acts and letters of his agent, although at the time of the trial there had been on file for more than a year a bill of particulars which gave dates of alleged waivers by defendant, which he must have reasonably inferred were claimed to have been made by the acts or declarations of his sole representative here, Collins. Moreover, the defendant himself introduced in evidence, as a part of his case, two letters in the series, each signed "C. P. Treat, Collins," one of which, dated May 20, 1899, was certainly material in the very view of the matter claimed to be correct by the plaintiff.

We cannot hold that the letters of Collins were improperly admitted, or that they must not be considered as binding on Treat, whose declarations by his agent they purported to be.

These letters running from May, 1899, to December 5, 1900, bear out the plaintiff's contention that during that time the contracts were by the defendant considered and treated as in force. They contained advice and suggestions as to Mrs. Smith's procuring loans on the lots and notified her of taxes and assessments and tax claims. They treated the property as primarily hers, but requested further payments on account of the contracts. As late as December, 1900, Mr. Collins (in the name of Treat) says, "I am still waiting for you to make some payments on account.  *  *  *  I wish you would plase remit me something on account.  *  *  *  I have made enough concessions to you and now expect you

to take care of the property. I do not care to take back any more of them. Have already taken back 15 out of 20, which is quite enough I think to ask of me."

It is said that a letter of Mrs. Smith received May 15, 1899, by Mr. Collins, and another received May 20, 1899, showed an abandonment on her part of the lots and of any attempt to fulfill her contract in the future. They were despondent and discouraged in tone, but we think they were not intended, and they certainly were not understood by the recipient, to be letters of abandonment. On May 22, 1899, we find Mrs. Smith, on the contrary, speaking about her "equity," and asking advice as to what she should offer it for sale for. She evidently then did not regard her right in the property as abandoned. On August 19, 1899, Mr. Collins tells her of an offer he had of $1,000 for the five lots, and asks her if she will sell them for that sum, advising her to do so, although he assures her it is a low price. She did not owe a thousand dollars on them at that time, and it is not to be presumed that with this offer made to her she abandoned the lots. She evidently declined the offer and requested Mr. Collins to procure her a loan of $1,000 on the lots, and he replies under date of September 8, 1899, that he knows a party who he thinks would make the loan at 6 per cent, and says: "I think you are wise to borrow on the property and hold it for a time yet. You will certainly get more for it later."

The next question presented to us for decision then, is what effect this recognition by the defendant of Mrs. Smith's rights in the property for so many years after the last payments made by her or credits given to her on the contracts, had on his right to declare the contracts forfeited and the rights of Mrs. Smith forever annulled.

The appellee first calls attention to the peculiarity of the contracts in that they give to the vendor, in case of default in payments by the purchaser, an option by election to treat the covenants and liability of the purchaser as living, obligatory and enforceable, and to collect all the consideration money from the purchaser by proper proceedings in law or

Treat v. Smith.

equity.   She contends that the action of the appellant shows that he made his election, and also contends that having made it, he could not afterwards withdraw or modify it.

We are not prepared to say that this position is not well taken, nor that the appellant would not, after the course of conduct and declarations imputable to him, be compelled, in order to enforce his legal rights under the contracts, to proceed either in equity to foreclose the plaintiff's rights to the land, or at law to secure judgment against her, when he might levy on and sell her interest in these lots under execution.

The clause in the contracts, on which the defendant relies to avoid this result of the alleged election, assuming that it is proven, viz. : "Nothing herein contained shall be construed as a waiver of the right of said party of the first part to declare this contract forfeited for non-payment as hereinbefore provided," may well, we think, be construed so as to make the first "herein" refer to that paragraph or section of the contract only, in which the clause occurs.   In other words, it may well be considered that it is only the provision that the purchaser agrees to pay interest on any defaulted payment, which shall not have the effect of waiving the right of the vendor to declare the contract forfeited for such default.

But we do not feel ourselves called on to decide this question, for we are clearly of the opinion that even if without legal proceedings in equity or by execution, the defendant could properly have foreclosed and forfeited the interest of the plaintiff in these contracts and the land described in them, he could not do so except in the manner indicated by this court in Vider v. Ferguson, 88 Ill. App., 136, and by the courts whose decisions were therein cited, as alone effective where such communications had been made to the vendee in a contract like this as would induce in his mind the conviction that the provision that time was of the essence of the contract would not be insisted on.   That manner involves a reasonable notice served on the vendee of an intention to be subsequently carried out, of resorting to the strict terms of the contract and declaring a forfeiture.

No such notice was given here—no intimation that this

course of enforcing defendant's rights was to be taken appears in the correspondence—but under the date of August 3, 1901, a letter signed "C. P. Treat, Collins," contained the announcement that the course had been adopted. "You must know," it says, "that the same" (the contracts) "have been cancelled on face of cont. for non-payment, consequently you have no further interest in the property," etc., and it appears by Mr. Collins' testimony that he wrote on the face of the five contracts, "Forfeited for non-performance of conditions," upon Mr. Treat's verbal order and instruction— Treat then being in Chicago,—on January 5, 1901. These memoranda were signed by Mr. Treat. We fail to find any distinction making a difference in principle between the facts in Vider v. Ferguson (*supra*) and the case at bar, and this court is still of the opinion as to the rules of law applicable, that it was when the opinion in Vider v. Ferguson was rendered. We do not think the attempted forfeiture of the contracts was effective, nor that there is any evidence that before or after the attempt was made the plaintiff abandoned the said contracts until the conveyance of the lots by the defendant to a third party occurred on October 22, 1902.

The remaining question is the effect of that conveyance on the rights of Mrs. Smith.

We think it gave her the right to treat the contracts as rescinded by the defendant at her election—which she has made by bringing this suit, and that what this court said the parties did in Vider v. Ferguson, the parties here have done —made a rescission of the contract by mutual consent, the defendant ceasing to claim from the plaintiff any of the purchase money due by the terms of the contract, and the plaintiff ceasing to claim any interest in the premises described in them.

Under these circumstances, as the Supreme Court said in Hurd v. Denny, 16 Ill., 492, the vendee under the contracts was entitled to recover back what had been advanced without performing a condition precedent to a specific enforcement of the contract. This doctrine has not since been departed from.

The proper rule of damages seems to us to have been fol-

lowed in computing them at the amount credited in the contracts, with interest from the time of the conveyance by the defendant to a third party.

The rulings on propositions of law held and refused are in accordance with our views herein expressed.

The judgment of the Superior Court is therefore affirmed.

*Affirmed.*